UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————X

UNITED STATES OF AMERICA,                           :

                                                    :

            -against-                               7:24-cr-00569-001 (KMK)

                                                    :

Kimberly O'Rorke,                                   :

                    Defendant.                      :
————————————————————X


**MEMORANDUM IN AID OF SENTENCING**
**<u>ON BEHALF OF KIMBERLY O'RORKE</u>**


SCOTT E. MIGDEN, ESQ.
LAW OFFICES OF ROBERT TSIGLER
Phone: (718) 878-3781
Direct: (718) 701-5405
sm@TsiglerLaw.com


*Attorneys for Kimberly O'Rorke*

## Table of Contents

I.  Preliminary Statement ...................................................................................·· 1

II.  Relief Sought ................................................................................................ 1

III. Procedural Background .................................................................................. 3

    A. The Plea Agreement and the Presentence Report ...................................... 4

    B. The Guidelines Calculation ...................................................................... 4

IV.  The 18 U.S.C. § 3553(a) Factors .................................................................. 4

    A. The Nature and Circumstances of the Offense and the History and
       Characteristics of the Defendant ……………………………………………… 6

       *i. Nature and Circumstances of the Offense* ............................... 6
       *ii. Family and Personal Background* ........................................... 8
       *iii. Prior Convictions* .............................................................. 11
       *iv. Educational and Employment History* ................................. 11
       *v. Physical, Medical and Mental Health* .................................. 14
       *vi. Substance Abuse* ............................................................... 17

    B.  The Need For the Sentence Imposed ........................................................ 17

    C.  The Kinds of Sentences Available ........................................................... 23

    D.  The Kinds of Sentence and the Sentencing Range Established
       for Defendant's Offense (The Guidelines Recommendation) ...................... 23

    E.  Pertinent Policy Statement(s) of the Sentencing Commission ................... 25

    F.  The Need to Avoid Unwarranted Sentencing Disparities ........................... 26

    G.  The 18 U.S.C. § 3572(a) Factors ............................................................. 28

V.  **Conclusion** ....................................................................................................29

**List of Exhibits** (Separately Attached)

Ex. A - O'Rorke, Amy. Letter to Judge Karas. (02/03/25)

Ex. B - O'Rorke, Axel. Letter to Judge Karas. (04/14/25)

Ex. C - O'Rorke, L.  Letter to Judge Karas. (04/10/25)

Ex. D - Genovese, A. Letter to Judge Karas. (04/12/25)

Ex. E - Harper, L.  Letter to Judge Karas. (02/06/25)

Ex. F - Izummou, Rev. E.  Letter to Judge Karas. (01/16/25)

Ex. G - Paovella, W.  Letter to Judge Karas. (02/18/25)

Ex. H - Rizzo, P.  Letter to Judge Karas. (01/24/25)

Ex. I - Education, Training records (4)

Ex. J - FDNY Commendations

Ex. K - WTC Certificate of Appreciation

Ex. L - Village of Mamaroneck PD - Civil Service Exams

Ex. M - Mamaroneck Town Police - Civil Service records (5)

## I.    PRELIMINARY STATEMENT

Defendant Kimberly O'Rorke respectfully submits this memorandum in aid of her sentencing, scheduled for May 14, 2025, following her earlier plea of guilty, pursuant to plea agreement, to Count 1 of an information charging Distribution of Cocaine, Fentanyl, and Oxycodone, 21 U.S.C. § 841(a), 21 U.S.C. § 841(b)(1)(C).

Ms. O'Rorke's life has been characterized by sustained employment from 2003 until 2018 and unwavering dedication to providing pre-hospital care to patients in critical or urgent situations as an FDNY EMT.  Attached to this memorandum (as separate exhibits) are letters of support demonstrating that Ms. O'Rorke's conduct in this matter is a complete departure from— and irreconcilable with—her care and compassion for others, including the homeless and stray animals.  Collectively, these letters in support of leniency and related certificates and commendations acknowledging her selflessness and life-saving services performed on the behalf of others make abundantly clear that the instant offense was unpredictable, incompatible with her character and further, that she poses zero risk of future recidivism.

## II.    RELIEF SOUGHT

We recognize that, as this Court has observed, "it is obvious that sentencing is the most sensitive, and difficult, task that any judge is called upon to undertake."  *U.S. v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), aff'd, 301 F. App'x 93 (2d Cir. 2008).  As in *Adelson*, we would offer that this case warrants a "greater reliance on the more general considerations set forth in § 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."  *Id*.

1

For the reasons set forth below, including: her mental health struggles since adolescence and efforts to overcome those ailments; the trauma of sexual abuse she endured both as a teenager and later during her early tenure as an FDNY EMT; and her strong employment history and vocational background, it is respectfully submitted that the Court impose a non-guidelines sentence of four years of probation, 250 hours of community service and a special condition that she participate in an outpatient mental health treatment program approved by the United States Probation Office to address her major depressive disorder, anxiety, and insomnia. Combined, those personal factors reduce her recidivism risk and increase her chances at rehabilitation, thereby obviating the need for a guideline sentence.

While this sentencing request calls for a substantial variance from the stipulated Guidelines range of 57 to 71 months' imprisonment, in our respectful view, it is "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. § 3553(a). Although we agree with Probation's evaluation that a variance is warranted here based in part on Ms. O'Rorke's having led a law-abiding life with a history of gainful employment and other positive personal characteristics and history, we disagree as to its breadth and counter that no term of imprisonment is required to satisfy the sentencing objectives of just punishment, respect for the law, and deterrence.

Ms. O'Rorke is in no way trying to justify or minimize her actions; she fully recognizes her criminal transgression, admits that her conduct was completely wrong and is determined to correct that misdeed. Even if given the opportunity to do so, she will already be haunted by the guilt resulting from her actions and the loss of life of a friend and confident which stems therefrom. Here, the proposed non-custodial sentence properly reflects the seriousness of the

offense, promotes respect for the law and provides just punishment for the offense.  See 18

U.S.C. § 3553(a)(2)(A).  In addition, the recommended sentence takes into account Ms.

O'Rorke's history and characteristics, affords adequate deterrence to criminal conduct by herself

and others, and protects the public from further crimes by her.  *Id*. § 3553(a)(1)–(2).

### III.    PROCEDURAL BACKGROUND

Ms. O'Rorke's arrest here stems from an investigation by a task force officer with the

Drug Enforcement Administration ("DEA") begun on November 8, 2023, in Mahopac, New

York, wherein Victim-1, a retired local police officer, was found unresponsive in his bedroom at

his residence.  He was pronounced dead upon arrival of first responders.  One month later, an

inquest by the Putnam County Coroner's Office, including an autopsy and toxicology analysis,

determined that Victim-1's cause of death was acute fentanyl intoxication.  The investigation

determined that Ms. O'Rorke sold Victim-1 (and others) controlled substances, including

opioids, up to and including November 7, 2023.  (January 8, 2025, Final Presentence

Investigation Report ("PSR") ¶¶ 10-15, ECF No. 32.)

Information 24 CR 569 (KMK) was filed in the Southern District of New York on

October 1, 2024, in the Southern District of New York.  (*Id*. ¶ 1.)  Count 1 of the Information

charges that between January 2021 and April 17, 2024, in the Southern District of New York and

elsewhere, Ms. O'Rorke knowingly and intentionally distributed and possessed with intent to

distribute fentanyl, cocaine, and oxycodone, in violation of 21 USC § 841(a)(1), and § 841(b)(1)

(C).  (*Id*. ¶ 2.)  On October 1, 2024, Ms. O'Rorke appeared before the Honorable Judith C.

McCarthy, United States Magistrate Judge, and allocuted to her criminal conduct as charged in

Count 1 of Information 24 CR 569 (KMK).  (*Id*. ¶ 3.)

Ms. O'Rorke is presently at liberty, having been released on April 17, 2024, on bond with Pretrial Services supervision. (*Id.* ¶ 6.) Her supervising Pretrial Services Officer conveys that Ms. O'Rorke has complied with all Court-ordered conditions of release. (*Id.*)

Her conduct in reference to the instant charges is adequately explained in the PSR (ECF No. 32) at ¶¶ 7-15 ("The Offense Conduct") and will not not be repeated here.

### A.  The Plea Agreement and the Presentence Report

Ms. O'Rorke pleaded guilty pursuant to a written plea agreement dated, September 30, 2024.

### B.  The Guidelines Calculation

The parties agree that the offense level computation and criminal history calculation as contained in the PSR, ¶ 5(A-C), is accurate. Accordingly, the calculated applicable Guidelines sentencing range is 57 to 71 months' imprisonment. (*Id.* ¶ 5(C). Further, as to Count 1 she agrees to forfeit $5,000. (*Id.*)

## IV.  The 18 U.S.C. § 3553(a) Factors

18 U.S.C. § 3553 outlines the procedures for imposing sentence in a criminal case. The "starting point and the initial benchmark" in evaluating a criminal sentence is the Guidelines sentencing range. *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007). Section 3553(a) provides a set of seven factors for the Court to consider in determining what sentence to impose on a criminal defendant. *United States v. Savarese*, No. 12-CR-421 (WFK), 2020 U.S. Dist. LEXIS 221708 (E.D.N.Y. Nov. 25, 2020). See also, *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005) ([S]entencing judges remain under a duty with respect

to the Guidelines--not the previously imposed duty to apply the Guidelines, but the continuing duty to "consider" them, along with the other factors listed in section 3553(a)).

When considered in their entirety, Ms. O'Rorke respectfully submits that a sentence below the current guidelines range which imposes a lengthy period of probation, includes extensive community service and adds a special condition of (continuing) mental health treatment, is sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). Under the statutory sentencing scheme, because Count One is a Class C Felony, Ms. O'Rorke is eligible for not less than one nor more than five years probation. 18 U.S.C. § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service. 18 U.S.C. § 3563(a) (2).

Consistent with case law in this district, an appropriate sentence should, among other things, reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense. See 18 U.S.C. § 3553(a)(2)(A); *United States v. Jamison*, 838 F. App'x 622 (2d Cir. 2021). In addition, an appropriate sentence should take into account the history and characteristics of the defendant, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. *Id.*; § 3553(a)(1)–(2). In weighing these factors, "a district court has broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence.'" *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) (quoting *United States v. Sanchez*, 517 F.3d 651, 660 (2d Cir. 2008)).

Ms. O'Rorke stands before this Court as a first offender and the applicable Guidelines range falls within Zone D of the Sentencing Table. Within Zone D, she is not eligible for

probation, absent a departure or variance.  *Cf*, 18 U.S.C. § 3561(c)(1) (authorizing a statutory period of probation for a felony, not less than one nor more than five years).  If Ms. O'Rorke is sentenced to any period of incarceration she will continue to face numerous collateral consequences.  Given her background and training as a former FDNY EMT, many of the certifications she presently holds will be rendered useless, limiting her future employment options.  Her history of bravery and life-saving services, performed over 17 years, is permanently tarnished.  While these consequences, admittedly, were caused by Ms. O'Rorke herself, their cumulative toll weigh in favor leniency.

**A.  The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

*i.  Nature and Circumstances of the Offense*

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).

Ms. O'Rorke is awaiting sentence after having pleaded guilty to knowingly and intentionally distributed and possessed with intent to distribute fentanyl, cocaine, and oxycodone. By and through her allocution, she has clearly demonstrated acceptance of responsibility for the offense.  However, she claims that as to the sale of mixtures containing fentanyl specifically, she did so unknowingly.  She maintains her unawareness that any of the different substances she sold to Victim-1 (or the other individuals claimed) contained fentanyl.  She *does not* dispute that the drugs she sold to Victim-1 resulted in his death, and is overwhelmingly remorseful for this tragic fatality, particularly since she described him as "a good friend who was "the nicest guy [she] ever met," a confidant with whom she discussed intimate details of each other's life and who called

6

her on holidays, birthdays, and spent substantial time at her home." (PSR ¶ 25.)

Ms. O'Rorke's conduct in this matter is wholly at odds with her character and the qualities she has demonstrated from early in life, particularly the attributes of compassion and selflessness. As described in one of the various reference letters to the Court in support of leniency:

> "When Kim became EMS in the FDNY, we were so proud of her. She was very passionate about her job and never hesitated when putting herself at risk when responding to a call and going above and beyond during recovery efforts. She took her job very seriously and was responsible for saving many lives. However, this job was very taxing on her both physically and mentally. Kim would get very upset when responding to a call involving children in particular. It was hard for her to go home after a shift and not remember many tragic events she was forced to see, her compassion for the victims was clear and she wore these emotions on her sleeve.
>
> \*      \*      \*
>
> While working in NYC, Kim was always helping others, especially homeless people. She would collect clothes and food to distribute to those in need. In addition, she even attended a few of their funerals. If there was a homeless person that she realized was not around for a little while, she would actively seek them out to make sure they were ok and provide assistance as needed.
>
> In addition, Kim went above and beyond for animals. Sometimes bags of kittens would get dropped of in front of her firehouse or left in the garbage by her job in the South Bronx. Locals would also call her letting her know of cats in need or distress. She was always willing to take them in and find them good homes."

*Ex. A* - O'Rorke, Amy. Letter to Judge Karas. (02/0325).

Adds a childhood friend:

> "Kims' former career as an FDNY EMT, which she loved so dearly, showed her dedication and selflessness to risk her own life to help others in need. It takes someone with strong will and compassion to have this type of career."

*Ex. E* - Harper, L.  Letter to Judge Karas. (02/06/25).

Further, these traits weren't limited to her employment or career:

> "I am writing to you on behalf of Kimberly O'Rorke, a devout woman who has shown unwavering dedication to her family, community, and those in need. As a Catholic priest, I have had the privilege of witnessing firsthand the positive impact she has had on those around her.
>
> \*     \*     \*
>
> Furthermore, Kimberly has been an active member of our community for many years, volunteering her time and resources to various charitable organizations and community initiatives. nI 2020 when New York was being ravaged by Covid-19 pandemic, Kimberly stepped up, risking her life ot assist the elderly and the young. Ihave known Kimberly as someone who is so selfless and would always put her life on the line for others. Her selfless dedication to helping others has touched the lives of many and has made a lasting impact on our community."

*Ex. F* - Izummou, Rev. E.  Letter to Judge Karas. (01/16/25).

These testaments are an accurate indication of who Ms. O'Rorke is, in contrast to the picture one would draw from the conduct charged here; the disparity is striking.  The cumulative letters submitted on her behalf are much more reflective of her virtues and a provide a fair justification for a substantial variance from the calculated sentencing range.

### ii.   *Family and Personal Background*

Kimberly O'Rorke is 42 years old, born in in Port Chester, New York.  She is one of three children born to the marital union of Andrew O'Rorke and Laurie (nee Paovella) O'Rorke. The defendant's father, approximately age 65, is the owner of a heating, ventilation, and air conditioning (HVAC) company, and resides in Mamaroneck, New York.  The defendant's mother, age 69, works with her husband at the business and resides in Mamaroneck, New York.  Ms. O'Rorke has two siblings: Amy O'Rorke, age 43, is the office manager for the family business and resides in Danbury, Connecticut.  Axel O'Rorke (formerly Kelly O'Rorke), age 27, who is employed as a private investigator and resides in Mamaroneck, New York.  (PSR ¶ 46.)

8

By all standards, the family is cohesive, loving and supportive.

She is also a single mother to her 16-year-old son, Justin. Justin needs stability, and her presence is essential as he navigates his challenging teen years. Two years ago, he was struggling in school during the seventh and eighth grades. Ms. O'Rorke claims that Justin was smoking marijuana and exhibiting behavioral issues during this period. She believes his issues stemmed from her working two jobs during his childhood and that her absence affected him. Together, over the last 1.5 years, he and his mother have diligently worked to overcome his behavior and anger issues, leading to remarkable progress and improvement in his current state. The family is concerned that without his mother's presence, he may regress and lose all the progress he has made. Should a term of imprisonment be imposed, Ms. O'Rorke stated that this will be detrimental to her son as he does not want to reside with his grandparents and has pushed his father away. She fears Justin will "give up" and he would drop out of school. (PSR ¶ 57.)

According to Ms. O'Rorke's brother Axel:

"Kim is a single mother and has been working hard with her son Justin, who just turned 17, to get him back on the right path. We could see that Justin was starting to head down a path that was not the best, and she worked with him on whatever he needed. She got him into therapy, into sports, into learning the ins and outs of HVAC via the family business, and into a better mindset. Justin started to blossom, and it has been so great to see, I'm so proud of them both, they have both overcome a lot in their lives. I'm afraid that if Kim is taken away from Justin, he will give up altogether and fall back into old habits and choose to not continue his education. He's a smart kid with a good head on his shoulders and Kim is a big source of love, support, and guidance for him."

*Ex. B* - O_Rorke, Axel. Letter to Judge Karas. (04/14/25).

Justin's grandmother adds:

"But more than being a dedicated paramedic, my daughter is a mother. She is a single parent ot her 17-year-old son, who loves and needs her more than anything.

He has had his own struggles, had a difficult time in school, needed extra help, and at one point was getting into trouble. She didn't give up on him; she fought for him, stepped up, and made sure he got the support he needed. Because of her dedication, he made a full turnaround and si now on the right path. He is a good boy, but he is still young, and he still needs his mother. Of course, he has us, but we are deeply afraid of what will happen to him if she is taken away. We fear that without her guidance, love, and support, he may lose his way again."

*Ex. C* - O'Rorke, L.  Letter to Judge Karas. (04/10/25).

### Relationship History

Since 2014, Ms. O'Rorke has been involved in a relationship with Nick Camacho, age 40, who is employed in Westchester County Social Services Department (mental health division) and resides with her.  (PSR ¶ 52.)  Their relationship is toxic and highly dysfunctional.  She characterizes Mr. Camacho as verbally abusive and they have had at least three verbal arguments which have turned physical: one he was arrested for, another in which he choked her and threw her onto the floor, and an episode in which he fractured her ribs' after throwing out her luggage. (*Id.*)  Ms. O'Rorke has (and presented) copies of hospital admission and discharge letters from Greenwich Hospital Emergency Room, Greenwich, Connecticut, confirming that she was treated on October 1, 2020, for an assault.  She was also treated for head trauma, three rib fractures and an upper sternal fracture. She claims to remain in the relationship because she cannot afford to reside alone financially; therefore, Mr. Camacho continues to reside with her.  In efforts for her to avoid arguments with Mr. Camacho, she admitted that she stays at her parents' home late and by the time she arrives home, Mr. Camacho is asleep.  (*Id.*)

### iii. Prior Convictions

Ms. O'Rorke's criminal history includes one prior conviction for Driving While Intoxicated (2018), for which she was sentenced to a non-custodial sentence.  (*Id.* ¶ 39.)

### iv. Educational and Employment History

Ms. O'Rorke has always been drawn and committed to the virtues of work; she began working in the family deli as early as age 12.  Since November 2024, she has been assisting her father with the family business.  Specifically, she's responsible for scanning files into a computer. Additionally, she assists her mother with entering payroll numbers in the business ledger.  (PSR ¶ 89.)

With the exception of approximately a four-month period in 2019, when she was a participant at the corrections academy at Westchester County Corrections Department, Valhalla, New York, Ms. O'Rorke's entire adult career revolved around being an emergency medical service technician ("EMT") with both the FDNY and as a volunteer with the Town of Mamaroneck Fire Department—for which she received a Certificate of Appreciation from its Mayor in 2001, for her dedication and service at the World Trade Center on 09/11.  See, *Ex. K -* WTC Certificate of Appreciation.

> "To me, she is a hero who has risked her life on countless occasions to save the lives of others.  On September 11th, 2001, at just 19 years old, she and other first responders ran in the direction of danger, chaos, and destruction in the name of saving lives."

*Ex. B -* O'Rorke, Axel. Letter to Judge Karas. (04/14/25).

It's through this role within the Emergency Medical Services (EMS) system that Ms. O'Rorke defines herself and measures her humanity towards others.  She worked with the FDNY

as an EMT for 17 years—from 2003 to 2018.  Not surprisingly, a combination of long work hours, the politics of the workplace, and experiencing burn out led her to resign.  Caustically, she recalled seeing "too many terrible things" such as witnessing suicides, seeing children getting hurt and dying and the devastating results of fatal car accidents.  (PSR ¶ 94.)  The cumulative effect added an additional layer of sadness and anxiety to an already fragile psyche.  In fact, in discussing her future goals, Ms. O'Rorke admitted that she is struggling with the idea of returning to the emergency medical professional field as she believes she will be triggered by the instant offense.  (*Id*.)

Nevertheless, Ms. O'Rorke derived fulfillment from her position, owing in equal parts to her compassion for others, devotion to a career in which she might save lives and a selflessness arguably escapist behavior that permitted her to ignore her own emotional issues.

> "When Kim became EMS in the FDNY, we were so proud of her. She was very passionate about her job and never hesitated when putting herself at risk when responding to a call and going above and beyond during recovery efforts. She took her job very seriously and was responsible for saving many lives."

*Ex. A* - O'Rorke, Amy. Letter to Judge Karas. (02/03/25).

> "When faced with sexism, misogyny, harassment, and retaliation at the FDNY, she did not falter or crumble. She took and still takes great pride in her work with the fire department, and we were all equally as proud of her, we still are. Not many people have the stomach or heart to be able to be in that line of work. To me, she is a hero who has risked her life on countless occasions to save the lives of others."

*Ex. B* - O'Rorke, Axel. Letter to Judge Karas. (04/14/25).

> "I had the privilege and honor to attend her graduation from the FDNY Academy. That was the happiest I have ever seen her. Working for the FDNY was a dream of hers and after al the hard work she put in, it finally became a reality. Her career was the foundation of her life. She took her job very seriously and was a dedicated worker, rarely ever denying overtime."

*Ex. E* - Harper, L.  Letter to Judge Karas. (02/06/25).

Ms. O'Rorke marked her identity through her skill as an EMT.   During her tenure, she received various acknowledgments and commendations for, among other things:

- Achieving a "Return of Spontaneous Circulation" ("ROSC" - preventing cardiac arrest) on a patient, performed in 2009;
- Achieving the same result in response to a call for a patient in cardiac arrest, in 2010; and
- For outstanding performance resulting in successful patient resuscitation on 05/19/2011.

See, *Ex. J* - FDNY Commendations. (Cumulative)

Despite the enormous and undue pressure attendant with rendering potentially life-saving procedures, from 2020 to 2021, Ms. O'Rorke chose employment as an independent medic through New Orleans Bio Innovation Center "Ready Responders."  (PSR ¶ 91.)  In that (temporary) position Ms. O'Rorke was provided with a computer and was dispatched to various homes in New York to test people for COVID, RSV and other infectious conditions.  She worked through the COVID epidemic, endangering her own health and well-being, going to people's home, rendering aid as needed.   (*Id.*)  She did so fearlessly and tirelessly.

*Educational, Vocational and Special Skills*

Up until 2023, Ms. O'Rorke  possessed her emergency medical technician (EMT) certification, based on her 17 years with the NYC FDNY.  (PSR ¶ 87.)

As of February 2024, Ms. O'Rorke graduated from The Cure Center (for Ultrasound Research and Education) in White Plains, NY, at which she received training for a cardiovascular ultrasound technologist.  (See *Ex. I* - Education & Training records.)  She has also successfully

completed more than 100 hours of training each in the areas of pharmacy technician, phlebotomy technician and EKG technician.  (*Id.*)  That she continues to improve and expand her vocational skills despite the uncertainty of her future speaks favorably about her capacity for rehabilitation and productive intentions following her conviction here.

As an aside, beginning in 2012 and then in 2018, Ms. O'Rorke passed the civil service exams in 5 separate towns and villages of Westchester County to become a Police Officer. However, the waiting lists for each were long and caused her to "age out" before ever being called.

###### v.   *Physical, Mental and Emotional Health*

Objectively, Ms. O'Rorke has issues for which she is currently seeing a therapist.  The multiple issues stem from emotional and physical trauma she endured beginning as early as 10-years old, again in her teens and later through her victimization early in her career as an FDNY EMT.  She has a history of participating in mental health counseling to address anorexia, body dysmorphia, mood disorder, and depression. Additionally, the defendant reported that she was diagnosed with Post-Traumatic Stress Disorder (PTSD) as a result of her time as an EMS technician with Mamaroneck FD and her employment with the NYC Fire Department.  (PSR ¶ 64.)  The full history of treatment—both in- and outpatient—is accurately related in the PSR at ¶¶ 65-70.  But, some elaboration is appropriate.

While attending middle school and high school, O'Rorke admitted that she struggled with her weight and self-esteem.  She and her sister, Amy, were always close and Amy had many friends.  However, Amy was thinner than O'Rorke and she was body shamed by her parents, classmates, and other individuals.  O'Rorke claims that she lost 90 pounds in nine months.  She

had been hospitalized a few times when she was approximately 16 or 17 years old due to her

obsession with losing weight and being accepted in society.  Ms. O'Rorke related that she

managed to gain better control of her weight when she was 20 years old as she began gaining

interest in the medical field due to her experiences.  (PSR ¶ 48.)

> "As a child, she was bullied for her weight, which led to a painful battle with
> anorexia throughout high school and into her early twenties. As a parent, ti was
> agonizing ot watch her suffer, and I had to make one of the hardest decisions of
> my life, to put her into treatment so she could live. No matter what life threw at
> her, she always found the strength to rise again and has always used that strength
> to help others."

*Ex. C* - O'Rorke, L.  Letter to Judge Karas. (04/10/25).

> "During Kimberly's teen years she was bullied for being overweight. This led to a
> health issue involving anorexia. Despite her struggles, she maintained a positive
> attitude and faced her problem head on by signing into a facility to receive
> professional treatment. I admired how brave she was throughout her struggle and
> ultimate victory of the disease."

*Ex. G* - Paovella, W.  Letter to Judge Karas. (02/18/25).

Additionally, while attending school, Ms. O'Rorke recalls that she struggled with a

learning disability (reading and writing).  She recalled needing extra help in her classes;

however, her mother believes that O'Rorke receiving "extra help" in her classes due to a learning

disability was frowned upon and caused O'Rorke additional embarrassment in school.  Each of

these experiences contributed to her damaged self-image and brittle emotional condition.

Sadly, Ms. O'Rorke has been the victim of sexual abuse twice: once as a teenager, then as

a young EMT with the FDNY.  Each instance has caused her shame and self-doubt, while also

providing her with a resolve and glimpses of inner-strength.

> "She has been shot at, had bones broken, and faced relentless misogyny as a
> woman in a male-dominated field, long before the Me Too movement gave

15

women a stronger voice.  She endured challenges that would break most people, but she never gave up.  Most devastatingly, she was sexually harassed and suffered sexual abuse at the hands of a superior.  When she bravely did the right thing and reported him, she faced retaliation.  Yet, despite all of this, despite the trauma, the pain, and the injustice, she still got up every day and did her job, saving lives and caring for strangers in their worst moments.

Even before she joined the FDNY, my daughter knew struggle. When she was 13 and helping out at our family deli, she was sexually assaulted by the boyfriend of one of our employees. She kept that secret and shame for a long time and it, in turn, festered into other areas of her life."

*Ex. C* - O'Rorke, L.  Letter to Judge Karas. (04/10/25).

"When faced with sexism, misogyny, harassment, and retaliation at the FDNY, she did not falter or crumble.  She took and still takes great pride in her work with the fire department, and we were all equally as proud of her, we still are."

*Ex. B* - O'Rorke, Axel. Letter to Judge Karas. (04/14/25).

Since April 2024, Ms. O'Rorke participates in individual mental health counseling with

Dr. Richard Kessler, New Rochelle, New York.  (PSR ¶ 71.)  On September 5, 2024, she

underwent a psychiatric evaluation with Dr. Herold Abellard M.D, St. Yves Medical &

Behavioral Health Services, P.L.L.C. New Rochelle, New York.  She was diagnosed with major

depressive disorder, and was prescribed separate medications to address symptoms of ADHD,

anxiety and insomnia.  (*Id.* 72.)

As to her physical health, she suffers from chronic back pain and arthritis in her spine

which stemmed from her work in the NYC Fire Department, but does not take pain medication

for the condition. (PSR ¶ 60.)  Currently, she meets with a pain management specialist, located in

Purchase, New York.  Progress notes from April 2023 to June 2024 confirm that Ms. O'Rorke

suffers from the following: inflammation of sacroiliac joint, lower back pain, lumbar

spondylosis, musculoskeletal finding, chronic arthropathy, and pain in right hip joint.  The

medical notes further reveal that she underwent two lumbar radio frequency ablations, described as a non-surgical procedure that uses radio waves to treat pain in the lower back, buttocks, hips, and groins; however, it appeared to have only provided temporary relief. Apparently, physical therapy and chiropractic treatment provide no relief. Accordingly, her doctor recommends that she undergo "intracept procedure," described as a minimally invasive outpatient procedure that treats chronic lower back pain by interrupting pain signals from the "basivertebral nerve." (*Id.* ¶ 61.) Ms. O'Rorke has not scheduled that procedure.

       *vi. Substance Abuse*

       Ms. O'Rorke first smoked marijuana in high school when she was 14 years old, but stopped almost immediately. (PSR ¶ 77.) She denies the use of any illicit substances and claims to have no frequent use of or affinity for alcohol. Notably, there is no history of of substance abuse by any member of her family. (*Id.*)

## B. The Need for the Sentence Imposed

       The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

**18 U.S.C. Section 3553(a)(2)(A)**

18 U.S.C. § 3553(a)(2)(A) demands that the penalty "provide just punishment for the offense" that simultaneously "afford[s] adequate deterrence to criminal conduct" and protects the public from further crimes of the defendant, as required by 18 U.S.C. § 3553(a)(2)(B), (C).

Ms. O'Rorke is a first offender for purposes of this matter. The Sentencing Reform Act, 28 U.S.C. § 994(j), directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than incarceration in cases in which the defendant is a first offender who has not been convicted of a crime of violence, or an otherwise serious offense." *Id*. It would not offend the spirit of that directive to impose a lengthy period of probation here, combined with an extensive amount of community service (250 hours) and an additional special condition requiring continued mental health treatment. The statutory sentencing provisions for the conviction here make Ms. O'Rorke eligible for not less than one nor more than five years probation. See, 18 U.S.C. § 3561(c)(1). See also, *United States v. Berson*, 2016 U.S. Dist. LEXIS 17107 (S.D.N.Y. Feb. 11, 2016). Such a sentence further provides a just punishment for Ms. O'Rorke, which in turn promotes respect for the law.

**18 U.S.C. Section 3553(a)(2)(B)**

The second factor listed in 18 U.S.C. § 3553(a)(2) is to "afford adequate deterrence from criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Here, a non-custodial sentence of 4 years probation combined with the other conditions will provide adequate general deterrence to the criminal conduct of others. This factor focuses on specific deterrence when it requires the Court to consider the need "to protect the public from further crimes of the defendant." Ms. O'Rorke is not a future risk to society and incarceration at the current Guidelines range is not needed. See

18

Michael Tonry, <u>Purposes and Functions of Sentencing</u>, 34 Crime & Just. 1, 28 (2006) (Research

has consistently shown that while the certainty of being caught and punished has a deterrent

effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent

effects."); see also Zvi D. Gabbay, <u>Exploring the Limits of the Restorative Justice Paradigm:</u>

<u>Restorative Justice and White Collar Crime</u>, 8 Cardozo J. Conflict Resol. 421, 447 (2007)

("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

See generally, *United States v. Lawrence*, 254 F. Supp. 3d 441 (E.D.N.Y. 2017)("[a] 'rational

offender' will decide whether or not to commit a crime by weighing the benefit of not

committing a crime with the benefit of committing the crime without being caught and the

benefit of committing a crime that results in being caught and punished." Def.'s Ex. B (Report of

Jeffrey Fagan. Ph.D.), at 4.)

The requested sentence can provide adequate general and specific deterrence. The

available empirical evidence does not support a finding that a prison sentence necessarily leads

to increased deterrent effects, regardless of the type of crime. See Andrew von Hirsch et al.,

Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (concluding

that "correlations between sentence severity and crime rates … were not sufficient to achieve

statistical significance," and that "the studies reviewed do not provide a basis for inferring that

increasing the severity of sentences generally is capable of enhancing deterrent effects");

Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of

Research 28-29 (2006)("[I]ncreases in severity of punishments do not yield significant (if any)

marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by

Republican presidents, reached that conclusion, as has every major survey of the evidence.").

Studies also demonstrate that, except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and imprisonment.  See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders, 48 Criminology 357 (2010) (study of more than 1,000 offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Commission has similarly found that "[t]here is no correlation between recidivism and guidelines 'offense level. … While surprising at first glance, this finding should be expected. The guidelines 'offense level is not intended or designed to predict recidivism."  U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004).

A more relevant predictor of recidivism is a defendant's criminal history, of which Ms. O'Rorke has only one state-court misdemeanor conviction for driving under the influence of alcohol, for which she received a certificate of relief (issued at the time of sentencing), which relieves her of all forfeitures, all disabilities and bars to employment, excluding right to retain or be eligible for public office.  Social science research indicates low recidivism rates for offenders with no prior criminal history.  In 2004, the USSC issued a report as part of its research series on

the recidivism of federal guidelines offenders entitled: Recidivism and the "First Offender": A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate, United States Sentencing Commission, May 2004.  In its report, the Commission notes:

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to reoffend. As such, they are deserving of reduced punishment.

*Id.*, at 1; *see also* 28 U.S.C. § 994(j).

The proposed sentence advocated here adequately punishes Ms. O'Rorke for her crime and provides both general and specific deterrence.  No other conduct in her employment history or personal background either mirrors or foreshadowed the acts she engaged in here.  As such, there is minimal likelihood that she would repeat this impropriety again.

**18 U.S.C. Section 3553(a)(2)(C)**

A non-custodial sentence combined with community service provides added general and specific deterrence which is more likely to protect the public from further crimes by Ms. O'Rorke, under 18 U.S.C. § 3553(a)(2)(C).

Here, Ms. O'Rorke's efforts to overcome her mental health ailments, and her strong employment history and vocational background are positive anti-criminogenic factors that reduce her recidivism risk and increase her chances at rehabilitation, thereby obviating the need for a guideline sentence.

While we in no way seek to minimize her misconduct, and continue to stand by the calculation of the Guidelines in the plea agreement, in the context of § 3553(a) and the parsimony clause, we respectfully submit that, in a case like Ms. O'Rorke's, a sentence of non-incarceration is appropriate.  Before the isolated behavior leading to the present charges and resulting conviction, she struggled greatly with her mental and emotional health since early childhood.  Despite the poor start, she developed inner-strength and was able to overcome her damaged self-image and disguised lack of confidence in order to express her compassion for others through her position as an EMT.  She has been working diligently to improve all aspects of her life and lead one of which her insular family can be proud.  Indeed, Ms. O'Rorke is the exact type of person who can learn from her mistakes and who is least likely to reoffend; one who is a worthy candidate to receive consideration and leniency from this Court.

As the *Gall* Court noted, a district court is well-situated to make determinations about the "character of the defendant" and whether, given such a character, the defendant is more or less likely "to return to criminal behavior" or constitute "a danger to society." *Gall*, 128 S. Ct. at 600-01.  By pleading guilty, Ms. O'Rorke has clearly demonstrated responsibility for this offense and this Court should find it highly unlikely that she will engage in similar behavior in the future.  Accordingly, the suggested non-Guidelines sentence of probation (with community service and a special condition of ongoing mental health treatment) will, with a high degree of probability, deter Ms. O'Rorke—and others similarly charged—from engaging in similar conduct, and justly punishes her for the severity of her actions.

### C.  The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]"  18 U.S.C. § 3553(a)(3).

Defendant stands before the Court having pled guilty to one count of Distribution of Cocaine, Fentanyl, and Oxycodone.  The offense is a Class C felony.  She faces not more than 20 years' imprisonment and is eligible for not less than one nor more than five years' probation. 18 U.S.C. § 3561(c)(1).  One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service.  The Court must impose a term of supervised release of at least three years. 21 U.S.C. § 841(b)(1)(C).  The maximum fine is $1,000,000. 21 U.S.C. § 841(b)(1)(C). Restitution is not applicable in this case. 18 U.S.C. § 3663.  A special assessment of $100 is mandatory. 18 U.S.C. § 3013.

Under the terms of the Plea Agreement, as the result of committing the offense as cited in Count 1 of the charging document, Ms. O'Rorke agrees to forfeit to the United States, pursuant to 21 US.C. § 853, a sum of a $5,000.

### D.  The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]"  *Id.* § 3553(a)(4)(A).

As to Count One of the Information, the most appropriate guideline is U.S.S.G. § 2D1.1. Pursuant to U.S.S.G. § 2D1.1(a)(5) the offense level corresponds to the quantity of the controlled

substance involved in the offense. Because Ms. O'Rorke conspired to distribute 831.05

kilograms of converted drug weight, pursuant to U.S.S.G. § 2D1.1(c)(6), the base offense level is

28.

      Ms. O'Rorke has clearly demonstrated acceptance of responsibility through her allocution

and subsequent conduct before the imposition of sentence, so a two-level reduction is warranted,

pursuant to § 3E1.1(a).  Lastly, assuming Ms. O'Rorke has accepted responsibility as described in

the previous sentence, the Government should move at sentencing for an additional one-level

reduction, pursuant to § 3E1.1(b), because she gave timely notice of her intention to enter a plea

of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court

to allocate its resources efficiently.

      Based on the foregoing, the applicable Guidelines offense level is 25, for which the

applicable guidelines sentencing range is 57-71 months.  (PSR at ¶¶ 28-37.)  Ms. O'Rorke has

zero criminal history points resulting in a Criminal History Category of I.

      Under the facts presented here and the specific offender personal history and individual

characteristics, any period of imprisonment within this range would be greater than necessary to

achieve the goals of sentencing, while a non-guidelines sentence of 4 years probation combined

with 250 hours of community service, a special condition of continued mental health treatment

an order of forfeiture in the amount of $5,000 would be more than adequate to do so.  See, 18

U.S.C. § 3553(a).

      **i.  Sentencing Recommendations**

      The Government has not yet submitted a sentencing memorandum and its position is

unknown.  The U.S. Probation Office recommends a custodial sentence of 42 months, followed

by a period of supervised release of 3 years, reflecting a variance based on Ms. O'Rorke's

background, circumstances and characteristics.  (Recommendation, PSR at pgs. 30-31.)

Given a review of the 18 U.S.C. § 3553(a) factors thus far discussed, this Court should

find that Ms. O'Rorke justifies a non-Guideline sentence even lower than 42 months.  Although

we agree with Probation's assessment that a variance is warranted here based in part on Ms.

O'Rorke's employment history, her individual history and characteristics, her mental health

ailments, and her general compliance with Pretrial Services supervision, we disagree as to its

breadth and counter that no term of imprisonment is required to satisfy the sentencing objectives

of just punishment, respect for the law, and deterrence.

Counsel urges that viewed in the entirety, Ms. O'Rorke merits consideration, leniency and

a variance from that applicable range, such that would allow for a sentence of 4 years probation

that includes as a condition 250 hours of community service, a mental health and treatment

condition and forfeiture in the amount of $5,000.  This would enable her, in part, to access the

resources and treatment needed for her diagnosed major depressive disorder and anxiety while

caring for her adolescent son.

### E.  Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor, requires the Court to evaluate "any pertinent policy

statement . . . issued by the Sentencing Commission," 18 U.S.C. § 3553(a)(5).

At the outset, we recognize that the following factors are generally disfavored as grounds

for a downward departure and Ms. O'Rorke is not arguing for one.  However, to the extent that

they may impact the Court's decision as to whether or not a variance is warranted and if so, to

what degree, they are provided for consideration.

§ 5H1.2. Education and Vocational Skills (Policy Statement)

Education and vocational skills are not ordinarily relevant in determining whether a departure is warranted.  However, education and vocational skills may be relevant in determining the conditions of probation or supervised release for rehabilitative purposes, for public protection by restricting activities that allow for the utilization of a certain skill, or in determining the appropriate type of community service.

§ 5H1.3. Mental and Emotional Conditions (Policy Statement)

Mental and emotional conditions may be relevant in determining the conditions of probation or supervised release; e.g., participation in a mental health program (see §§ 5B1.3(d)(5) and 5D1.3(d)(5)).

§ 5H1.5. Employment Record (Policy Statement)

Employment record is not ordinarily relevant in determining whether a departure is warranted.  Employment record may be relevant in determining the conditions of probation or supervised release (e.g., the appropriate hours of home detention).

**F.  The Need to Avoid Unwarranted Sentence Disparities [Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct]**

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Indeed, § 3553(a)(6) "requires a sentencing court to consider nationwide sentence disparities …."  *United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2012) (quoting *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008)).

On this point, we respectfully urge that the imposition of a probationary sentence would allow the Court to re-impose the full range of consequences available should Ms. O'Rorke misstep in the future.  Further, sentencing Ms. O'Rorke to a period of probation would not yield an outlier from sentencing practice in this district nor result in a sentencing disparity.

According to the U.S. Sentencing Commission's JSIN database (https://www.ussc.gov/guidelines/judiciary-sentencing-information), during the last five fiscal years (FY2019-2023), there were 105 defendants whose primary guideline was §2D1.1 and Other was the primary drug type, with a Final Offense Level of 25 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure, nearly one in ten defendants (9%) were sentenced to a term of probation with or without a condition of community confinement, intermittent confinement or home detention.  (APPENDIX A (Judiciary Sentencing Information), PSR at pgs. 25-26.)  For the reasons stated in this Memorandum, and considering the other § 3553(a) factors, counsel's proposed sentencing recommendation of a non-custodial sentence rather than 57-71 months would avoid unwarranted sentence disparities between Ms. O'Rorke and other offenders convicted of similar conduct.  We posit that she is "of the 9%" who the Court should consider for a substantial variance from the guidelines sentence called for here.

Ms. O'Rorke' commission of the instant offense—both concerning and aberrational—does not rise to the level of egregious conduct despite that Victim-1's cause of death was acute fentanyl intoxication, because she was unaware that any of the different substances she sold to Victim-1 contained fentanyl.  The Sentencing Guidelines are designed in significant part to bring about nationwide uniformity in sentencing and to avoid unwarranted sentencing disparities.  See *Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2463-64, 168 L. Ed. 2d 203 (2007); *United*

*States v. Savin*, 349 F.3d 27, 34 (2d Cir. 2003) (noting that "a policy underlying the Guidelines is the promotion of 'reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders.'" (quoting U.S.S.G. ch. 1, pt. A, § 3 (1995)).  A non-Guidelines sentence here promotes the salutary goal of providing uniformity in sentencing.

The proposed sentencing recommendation made here on Ms. O'Rorke' behalf is the more appropriate sentence based on her history, characteristics, and the facts of the instant matter. With one exception, she has led a law-abiding life and has a verifiable—and at times life-saving —history of sustained, gainful employment; is the sole caretaker for her 17-year-old child and a sibling and daughter.  Further, she has endured emotional and psychological injury resulting from a dysfunctional relationship and suffered sexual abuse as a teen-ager, then again as an adult.  We are confident that based on all her positive personal characteristics and history, her recidivism risk is low.

### G.  The 18 U.S.C. § 3572(a) Factors

The seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).  Restitution is inapplicable in this case under 18 U.S.C. § 3663A.

## V.  Conclusion

For the foregoing reasons, the Court should sentence Ms. Kimberly O'Rorke to a non-guidelines sentence of four years of probation, 250 hours of community service and a special condition that she participate in an outpatient mental health treatment program approved by the United States Probation Office and forfeiture in the sum of $5,000, along with any other conditions that the Court deems necessary for Ms. O'Rorke's rehabilitation.

This recommended sentence is appropriate and comports with the dictates of § 3553. We respectfully submit that the proposed sentence is consistent with, and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2).

**Dated:**     New York, NY
              April 29, 2025

Respectfully submitted,

/s/      Scott E. Migden
SCOTT E. MIGDEN, ESQ.
LAW OFFICES OF ROBERT TSIGLER

*Attorneys for Defendant Kimberly O'Rorke*

cc:  AUSA Benjamin Levander (by ECF)